OPINIONS
{¶ 1} Relator, Beth M. Kleja, filed this action in mandamus seeking a writ which compels the State Teachers Retirement Board ("STRB") to vacate its decision denying her disability benefits and which compels the STRB to enter a new order granting the benefits. *Page 2 
 {¶ 2} In accord with Loc. R. 12, the case was referred to a magistrate to conduct appropriate proceedings. The parties stipulated the pertinent evidence and filed briefs. The magistrate then issued a magistrate's decision containing detailed findings of fact and conclusions of law, which is appended to this opinion. The magistrate's decision includes a recommendation that we deny the request for a writ.
 {¶ 3} Counsel for relator has filed objections to the magistrate's decision. The case is now before the court for review.
 {¶ 4} Relator worked for many years as an elementary school teacher in the Austintown Local School District. For many years, she suffered from health problems which caused frequent absences from the classroom.
 {¶ 5} In the spring of 2005, relator drove into the rear of a school bus which was parked at the school where she worked. The collision occurred shortly after 8:00 a.m. She was charged with and ultimately convicted of operating a vehicle while under the influence ("OVI"). She was placed on paid administrative leave and ultimately resigned her teaching position.
 {¶ 6} The following March, the State Board of Education issued notice of its intent to determine whether to suspend, revoke or limit her teaching certificate based upon her OVI conviction and the conduct underlying her conviction. Rather than contest revocation of her license, relator submitted a voluntary surrender form on July 24, 2006.
 {¶ 7} In August 2006, relator filed an application for disability benefits, alleging she would be unable to perform duties as a teacher for at least a 12-month period. She supported her application with reports from four physicians who had treated her. All four *Page 3 
described her as suffering from chronic fatigue and from immune deficiency condition. All four indicated that she would not be able to work as a teacher for at least 12 months.
 {¶ 8} None of the four physicians initially indicated an awareness of relator having lost her license to teach or of the reason for relator driving into the back of a school bus at around 8:00 a.m. while on the way to work. Thus, none of them assessed whether a drug problem or alcohol problem contributed to her chronic fatigue or immunity system problem.
 {¶ 9} As required by statute, relator was referred by the STRB for an independent medical examination ("IME"). Susan Koletar, M.D., performed the IME at the Infectious Diseases Clinic at the Ohio State University Medical Center. The IME focused upon the medical etiology of her fatigue. Dr. Koletar did not seriously contemplate substance abuse as having a role since relator denied any use of recreational drugs and claimed only occasional use of alcohol.
 {¶ 10} Dr. Koletar could not explain relator's symptoms, but was willing to accept the evaluation of relator's treating physicians and support a time-limited disability to assess treatable conditions which could explain her fatigue and immunity deficiency.
 {¶ 11} Shortly after it learned of the OVI conviction and relator's loss of her license to teach, a special conference of a panel of three doctors constituting a medical review board for STRB was convened. These three doctors all found that relator had not yet proved her entitlement to disability benefits. Instead, they referred the situation back to Dr. Koletar and to Claire V. Wolfe, M.D., a specialist in physical medicine and rehabilitation for another IME. *Page 4 
 {¶ 12} Dr. Wolfe inquired about the collision with the school bus. Relator denied alcohol consumption and attributed the collision to a reaction to her medication. She did not acknowledge her permanent license revocation, instead contending initially that she could not teach due to medical problems.
 {¶ 13} Dr. Wolfe issued a report finding that relator was not incapacitated, her chronic fatigue notwithstanding.
 {¶ 14} Where, as here, serious reasons exist to believe that a person is providing an inaccurate or even a deceptive medical history to physicians, a medical review board for the STRB has the right and perhaps even the obligation to refer the matter for further medical review. The medical review board also has the right to take the problem regarding the medical history into consideration when construing the medical reports which might be affected by that history. We find no defect in the proceedings before the STRB which resulted from the questionable medical history provided by relator.
 {¶ 15} The fact that Earl N. Metz, M.D., who was then the chair of the State Teachers Retirement System Medical Review Board placed the word "DENIAL" in capital letters on a notice of a special conference which was scheduled after the OVI conviction came to light is unfortunate, to say the least. Assuming "DENIAL" was Dr. Metz's view of the merits, the record does not demonstrate that the four other physicians (Dr. Wolfe and the medical review board members) who addressed the merits of relator's application thereafter let Dr. Metz do their thinking for them. The information in the record before us supports a finding that relator did not prove that she was medically incapable of teaching school. *Page 5 
 {¶ 16} We overrule the objections to the magistrate's decision. We adopt the findings of fact and conclusions of law in the magistrate's decision and deny the request for a writ.
Objections overruled; writ denied.
KLATT and CONNOR, JJ., concur. *Page 6 
 APPENDIX MAGISTRATE'S DECISION Rendered on January 30, 2009 IN MANDAMUS {¶ 17} In this original action, relator, Beth M. Kleja, requests a writ of mandamus ordering respondent, State Teachers Retirement Board ("STRB"), to vacate its decision denying relator's R.C. 3307.62(B) application for a disability benefit, and to enter a decision granting relator's application. *Page 7 
Findings of Fact:
 {¶ 18} 1. In August 2006, relator filed a "Disability Benefit Application" with the State Teachers Retirement System of Ohio ("STRS"). Relator had been employed as a teacher by the Austintown Local School District Board of Education.
 {¶ 19} 2. The STRS disability benefit application form asks the applicant to "describe * * * all physical and mental problems that you feel are disabling you in the performance of your duties." In response to the query, relator attached a detailed three-page letter dated August 10, 2006. The first full paragraph of relator's letter states:
 I am applying for disability due to continued, recurrent, long-term illness. The illness resembles a recurrent respiratory infection with bronchitis, flu-like, and mono-like symptoms that is often debilitating and incapacitating resulting in my being bedridden for extended periods of time. This has plagued me my entire teaching career of more than twenty-five years and has worsened and become more chronic as time goes on. I have actively sought medical help and treatment all along, but it has not resolved my condition. It has been over a year that I have not been working. During the past year, I was still ill most of the time and seemed to actually be getting worse. Due to the long-term nature and continuation of symptoms while not working, it seems improbable that my condition will improve. I had expected improvement since I don't have a schedule to follow, have much reduced stress, and can sleep and rest as much as needed. During the past year, I have been in contact with my primary care physician at least monthly and on antibiotics much of the time although they haven't resolved my illness. I am sending a summary of my condition and situation that will explain this in more detail.
 {¶ 20} 3. The STRS disability benefit application form asks the applicant to list any doctor "who will be submitting a report on your condition." In response, relator listed four doctors: (1) Barbara Modic, M.D., (2) Leonard Calabrese, D.O., (3) Antoine Chahine, M.D., and (4) Anthony Cutrona, M.D. *Page 8 
 {¶ 21} 4. STRS provides an "Attending Physician's Report" form to be completed by the doctors listed by the applicant. The form contains the following instruction to the physician:
 Disability benefits are provided only for the applicant who is permanently disabled for the performance of his/her regular position if the disability is permanent or presumed to be permanent in character and if significant recovery cannot be anticipated within 12 months. * * *
 {¶ 22} The STRS attending physician's report form also requires that the physician certify his or her opinion as to the applicant's disability. The preprinted certification reads as follows: "I hereby certify that in my opinion the above-named applicant [is or is not] incapacitated for the performance of duty and that the disability [is or is not] considered to be permanent."
 {¶ 23} 5. In June 2006, Dr. Modic completed an attending physician's report on which she certified that relator "is incapacitated for the performance of duty and that the disability is considered to be permanent."
 {¶ 24} The form asks the physician to present a "Diagnosis." Dr. Modic wrote in part: "Immunoglobulin deficiency of subclass IgG" and "chronic fatigue syndrome."
 {¶ 25} 6. In May 2006, Dr. Chahine completed an attending physician's report on which he certified that relator "is incapacitated for the performance of duty and that the disability is considered to be permanent." Under "Diagnosis," Dr. Chahine wrote: "Hypogammaglobulinemia." Under "General Summary of Applicant's Physical Condition," Dr. Chahine wrote: "Has chronic fatigue syndrome, hypogammaglobulinemia did not respond well to IVIG therapy." *Page 9 
 {¶ 26} 7. Dr. Cutrona also completed an attending physician's report on which he certified that relator "is incapacitated for the performance of duty and that the disability is considered to be permanent." Under "Diagnosis," Dr. Cutrona wrote: "Chronic sinusitis, IgG deficiency, Lyme disease." Under "General Summary of Applicant's Physical Condition," Dr. Cutrona wrote: "Chronic fatigue, weakness."
 {¶ 27} 8. Dr. Calabrese, a rheumatologist at the Cleveland Clinic Foundation, wrote on August 8, 2005 as follows:
 I am writing regarding my patient Beth Kleja whom I have seen at the Cleveland Clinic Foundation from 2001 and beyond. She carries a diagnosis of chronic fatigue syndrome with mild humoral immune deficiency.
 We have prescribed treatment with graded exercise, nutrition, and stress modification and she has adhered to all treatment protocols over these years. Unfortunately, she is still highly symptomatic.
 I saw her last on August 8. She still complains of severe fatigue, diffuse muscle aching, and recurrent sore throats, fever and chills. These recur on a recurrent basis and have precluded reasonable accommodation in the workplace. She has missed a large amount of work due to the unpredictable nature of her recurrent symptoms.
 On our disability scale, she ranks at 50%, which is "moderate symptoms at rest, moderate-to-sever symptoms with exercise or activity, overall activity reduced to 70% of expected, unable to perform strenuous duties but able to perform light duty or desk work 4-5 hours a day but requires rest periods". While she may be productive in some settings, her need for rest and recuperation is unpredictable and difficult to accommodate in the workplace.
 Given the long nature of these symptoms, I think that from her primary profession she is permanently and totally disabled. * * * *Page 10 
 {¶ 28} 9. By letter dated August 22, 2006, Earl N. Metz, M.D., the chair of the STRS medical review board ("MRB"), requested that Susan Koletar, M.D., examine relator. Dr. Koletar is a professor of internal medicine at The Ohio State University Medical Center, Division of Infectious Diseases.
 {¶ 29} 10. On September 7, 2006, Dr. Koletar examined relator and, thereafter, issued a three-page narrative report dated September 11, 2006. In her report, Dr. Koletar states:
 Ms[.] Kleja is a 51 year old woman with a history of recurrent respiratory tract infections and chronic fatigue. She states that since she has been in her 20's she has had intermittent problems with upper and lower respiratory tract infections, frequently with associated constitutional symptoms of low-grade fevers and night sweats which nearly always results in some period of debilitating fatigue. She is often treated with antibiotics and in fact was just finishing a 10 day course of clarithromycin (Biaxin).
 She has been an elementary school teacher for approximately 25 years, but reports that she has been plagued most of her career by illnesses that have annually depleted all of her accrued sick leave. She stopped working about 1 ½ years ago due to extreme fatigue.
 She has had extensive evaluations over a number of years by a number of subspecialists for these complaints, including Infectious Diseases and Immunology. She reports that she had been treated for Lyme Disease and also had received several courses of IVIG for a mild immunoglobulin deficiency that is alluded to in the supporting documents that I had received. * * *
 * * *
 Impression:
 Chronic fatigue
 History of mild immunoglobulin deficiency *Page 11 
 Recommendations[:]
 Although a number of infectious pathogens have been implicated, the actual etiology (infectious or non-infectious) of chronic fatigue syndrome remains elusive and undefined. Similarly, the non-specific symptoms typically wax and wane over time and cause varying degrees of disability over varying lengths of time.
 As for Ms. Kleja, she currently does not seem to have any active infections that would explain her ongoing symptoms and her perceived disability. That being said, I do not have any current laboratory studies (e.g., hemogram, thyroid studies, immunological tests) that could also provide potential explanations for her symptoms. Considering her history of extensive evaluations by other subspecialists, I would support continuing a time-limited disability to assure that there are no other treatable conditions that would allow this woman to return to her teaching profession.
 {¶ 30} 11. In a January 3, 2007 letter to Dr. Metz, Dr. Koletar wrote:
 I have reviewed the laboratory studies obtained following my initial consultation with Ms. Kleja. She is mildly leukopenic (although not technically neutropenic) and does have a slight IgG Subclass 2 deficiency; the clinical significance of the latter is unclear. Her renal function appears to be within normal limits. She is sero-negative for both HIV and hepatitis C.
 Unfortunately, these more recent laboratory studies do not add substantially to the case and I still do not have an obvious infectious etiology to explain her chronic fatigue. Unless she has some new localizing symptoms or a significant change in her constitutional symptoms, i.e., documented fevers, significant weight loss, I do not think that a re-examination would be helpful.
 {¶ 31} 12. In early January 2007, the treasurer of the Austintown Local School District Board of Education ("Austintown") completed an STRS form captioned "Report of Employer." The report and its various attachments were sent to STRS. *Page 12 
 {¶ 32} Attached to the report is a June 7, 2005 letter from the Austintown superintendent to the treasurer:
 * * * Beth A. Kleja was placed on paid administrative leave effective April 20, 2005 through June 13, 2005, using accumulated sick days, emergency and personal leave. Mrs. Kleja resigned from her teaching position effective August 26, 2005.
 {¶ 33} Also attached to the report is a newspaper clipping which states:
 * * * An elementary school teacher has been charged with DUI and placed on paid administrative leave after running into a school bus Wednesday morning on her way to school.
 Shortly after 8 a.m., a vehicle driven by Beth M. Kleja, 50, struck the rear of the bus that was parked at Lloyd Elementary School where she teaches second grade. No one was injured, and both vehicles sustained minor damage.
 Kleja, a teacher with the district since 1979, is to appear May 9 in Mahoning County Area Court.
 Police said they administered a field sobriety test that Kleja failed. A blood test was performed, but results aren't expected for at least a few days.
 Kleja has no prior DUI offenses, police said.
 Superintendent Stan Watson said the paid administrative leave is effective immediately.
 {¶ 34} 13. The "Report of Employer" was received by STRS on January 8, 2007 as indicated by the file stamp date contained on the document.
 {¶ 35} 14. On January 9, 2007, one day after STRS received the "Report of Employer," Dr. Metz scheduled a "Special Conference" for January 22, 2007. The January 9, 2007 notice of the special conference indicates that relator's case will be reviewed. The word "DENIAL" appears in capitalization on the notice above relator's *Page 13 
case identification. No other case is listed as being under review at the conference. The notice further identifies three doctors who shall serve as the MRB panel on relator's case. Those doctors are Charles F. Wooley, M.D., Barry Friedman, M.D., and James N. Allen, M.D.
 {¶ 36} 15. Apparently, on January 22, 2007, Drs. Wooley, Friedman and Allen met in special conference. Thereafter, each doctor sent a written report to Dr. Metz regarding the conference.
 {¶ 37} 16. In a three-page report to Dr. Metz dated January 22, 2007, Dr. Allen states:
 On September 7, 2006, an independent medical examination was performed by infectious disease specialist, Dr. Susan Koletar, who determined that she had no active infection and that she had chronic fatigue and a history of mild immunoglobulin deficiency. Laboratory studies from October 20, 2006 indicated a white blood cell count of 2.6, total IgG of 647 mg/dL (normal 694-1618), IgG subclass 2 of 157 mg/dL (normal 242-700), negative hepatitis C, negative HIV, and normal TTG. Dr. Koletar recommended that she was incapacitated to perform her teaching duties.
 Also included in the disability materials was a copy of a newspaper article indicat[ing] that Mrs. Kleja was charged with driving while intoxicated after her vehicle struck a school bus parked in the parking lot of the school that she worked at when she was driving to work. She was placed on administrative leave on April 20, 2005 and resigned from the Austintown Local Schools on August 26, 2005.
 Publicly available documents of the minutes of the Ohio State Board of Education meeting from September 12, 2006, record that: "Beth M. Kleja, permanent revocation of an eight-year kindergarten/elementary teaching certificate, conviction in Case Number 05TRC-2260, the State of Ohio v. Beth M. Kleja, and the conduct underlying her conviction (voluntary surrender)." *Page 14 
 Medical Review Board Determination: In summary, this teacher claims disability due to IgG deficiency and chronic fatigue syndrome.
 With respect to IgG deficiency, up to 20% of the population has reduced levels of one or more IgG subclasses and the finding of reduced levels of isolated IgG subclass 2 does not in and of itself indicate a clinically significant condition. An impaired response to antigen/vaccine challenge is required in order to establish a confident diagnosis of immune deficiency. There is no accompanying information in the disability materials that vaccine challenge has been performed. Therefore, there is insufficient information available to establish a diagnosis of immune deficiency. Also, both she and Dr. Chahine noted that she did not improve after treatment with intravenous IgG therapy to replace missing immunoglobulin. This is strong evidence that her symptoms do not relate to IgG deficiency since IgG replacement will correct the attendant immunodeficiency.
 With respect to chronic fatigue syndrome, this is a diagnosis of exclusion. A 1991 National Institutes of Health panel recommended that a number of diseases be excluded including hypothyroidism, adrenal insufficiency, and others. Specifically, the panel recommended that testing include a TSH, cortisol level, PPD skin test, ANA, and calcium level. There is no documentation that these studies have been performed. Additionally, her conviction for driving while intoxicated on her way to work indicates that alcoholism is probable and this has also not been addressed in any of the documentation provided.
 The independent medical examination performed by Dr. Koletar indicates that Mrs. Kleja was not forthcoming with alcohol use and this may have affected Dr. Koletar's final impressions. Specifically, Dr. Koletar records in the history obtained from Mrs. Kleja that "She occasionally drinks alcohol." The Medical Board's opinion was that a person who consumed alcohol in the morning prior to reporting for her teaching duties, was involved in a motor vehicle accident on the school property, was arrested for driving while intoxicated, and then had her teaching certificate permanently revoked strongly suggests greater alcohol consumption than she reported to Dr. Koletar and suggests that Mrs. Kleja was not entirely forthcoming or truthful in the *Page 15 
history that she supplied to Dr. Koletar. This may have affected Dr. Koletar's opinion of Mrs. Kleja's impairment on the grounds of chronic fatigue syndrome.
 In conclusion, there is insufficient documentation available to support a diagnosis of immune deficiency. There is insufficient documentation to exclude conditions that can mimic chronic fatigue syndrome, including alcoholism. The Medical Review Board of the State Teacher's Retirement System recommended that disability retirement not be awarded on the basis of her stated disability. If continued questions remain regarding her eligibility for disability benefits on the grounds of immune deficiency and chronic fatigue syndrome, then an additional expert medical examination by an examiner who is fully apprised of Mrs. Kleja's alcohol-related offenses and convictions should be undertaken.
 {¶ 38} 17. In a one-page report to Dr. Metz dated January 23, 2007, Dr. Wooley states:
 Following review of the entire disability case the members of the Medical Review Board requested an additional opinion by Dr. Koletar following her review of the additional [pertinent] information, and also requested an additional Medical Examiner's evaluation prior to determination of disability.
 {¶ 39} 18. In a one-page report to Dr. Metz dated January 28, 2007, Dr. Friedman states:
 On January 22, 2007[,] the Medical Review Board of STRS met in special conference to review the disability application of Ms. Kleja, a 51 year-old lady who had been employed previously as a second grade teacher. Her disability application relates to chronic fatigue and mild Igg deficiency. The report previously submitted by Dr. Koletar was discussed. The additional information regarding alcohol abuse and Ms. Kleja's loss of her teacher's license was noted. After discussion[,] it was the unanimous recommendation of the Committee to ask Dr. Koletar to review Ms. Kleja's symptoms in light of this additional *Page 16 
information. It was also the recommendation to consider a second disability evaluation from Dr. Wolfe, a physiatrist.
 {¶ 40} 19. On March 20, 2007, at STRS's request, relator was examined by Claire V. Wolfe, M.D., who specializes in physical medicine and rehabilitation. In her four-page narrative report, Dr. Wolfe wrote:
 History: Beth M. Kleja is a 52-year-old woman who was an elementary school teacher with the Austintown local schools for 25 years. She last worked April 19, 2005 and states that the reason she stopped working was "recurrent respiratory infections." Ms. Kleja states that she found that she was pushing herself, getting more fatigued and getting more respiratory infections and in fact had had a lot of difficulty bouncing back from brain aneurysm surgery that she had had in August 2004. She had in fact taken FMLA because she could not return quickly after her brain surgery even though she did not, even by history, have any residual neurologic deficits after that surgery. (Her preoperative symptoms were dizziness).
 Data Review: I reviewed the extensive information sent to me on Ms. Kleja and her workups. This includes a 3-page typed discussion of her symptoms and a 2-page typed discussion of her job requirements that she had previously sent to STRS. Plus, she brought in today an additional 2-page updated summary, a copy of which I have copied for STRS and enclosed.
 Ms. Kleja noted in past documentation that I reviewed that she has had symptoms of "chronic fatigue" since childhood. She has always had trouble with recurrent bronchitis, throat and upper respiratory infections and so forth. She has been diagnosed with hypogammaglobinemia although I note that Dr. Koletar who saw her for an infectious disease IME called this "slight" IgG subclass II deficiency. The only other laboratory abnormality on Dr. Koletar's studies from Ohio State University was a mild decrease in white count to 2.6.
 Ms. Kleja was followed by Dr. Calabrese, from the Cleveland Clinic Rheumatology Department. A review of his dictation from August 8, 2005 noted only diagnosis of "chronic fatigue syndrome with mild humoral immune deficiency." Dr. *Page 17 
Calabrese did not include any laboratory studies although Ms. Kleja states that at least lupus was ruled out with various studies. Dr. Calabrese had recommended exercise and nutrition; Ms. Kleja states today that she was unable to tolerate the exercise, that it consistenly made her worse and that she also failed a trial of IVIG which actually made her worse as well.
 I have enclosed for STRS the first two pages of our intake sheets that Ms. Kleja completed. On page two, one notes that the review of systems [sic] is almost globally positive with many appended comments. On page one, there are multiple areas of dull aching that she graded primarily 3-4/10. She adds that she has been diagnosed with mitral valve prolapse and thyroid disease; she does take Synthroid 100 mcg a day. She is also currently on another round of antibiotic, doxycycline 100 mg, which she explains in her recent papers.
 * * *
 Social History: Ms. Kleja is married. She does not smoke. On the question about alcohol, she stated she had a glass of wine or beer with dinner occasionally. I did question Ms. Kleja about the information sent to me by STRS regarding a DUI conviction. She was somewhat evasive. She stated finally — and I had to prod — that she had not been drinking when the accident had occurred but instead had had a medication reaction. However, she chose not to fight the charge because of her health and her father's health. I have enclosed for STRS a copy of the State Board of Education of Ohio September 2006 meeting minutes. This was available on the State of Ohio web site on which I did an inquiry trying to get additional information on Ms. Kleja's charges. Those meeting minutes of September 2006 note that Ms. Kleja's teaching certificate was permanently revoked and she was made permanently ineligible to apply for any license issued by the State Board of Education. This revocation was based on her conviction for impaired driving. Ms. Kleja did not confirm for me any permanent revocation of her teaching certificate even though I tried to tactfully ask about this. She contends that she could not return to teaching because of her frequent absences due to her recurrent respiratory infections. *Page 18 
 Physical Examination: On physical examination today, Beth Kleja is a pleasant and cooperative 52-year-old woman who is somewhat pale and looks somewhat older than her stated age. I noticed Dr. Koletar mentioned that her affect was slightly flat. I do not think it was flat as much as she has somewhat of a masked response of her facial muscles. Her face just seemed stiff. It is the kind of facies you sometimes see in people with scleroderma or with early Parkinson's. However, she can smile, purse her lips, wrinkle her forehead and her skin on palpation feels normal. There is no loss of skin wrinkles at the ends of her digits. Her skin turgor elsewhere appears to be normal. She does have a mild facial asymmetry although she herself has not noticed one. Her tongue is fairly midline on protrusion. Her speech was clear and her extraocular motions intact without evidence of nystagmus.
 Neurologically, however, she is definitely more hyperreflexic on the left than she is on the right with a lot of overflow, a very brisk Hoffman but no Babinski. She has no clonus at either ankle. Her aneurysm defect is on the left side of her temple area which makes the left-sided hyperreflexia a little unusual.
 On manual muscle testing, there is no weakness in any of the four limbs and cooperation was excellent. There was no rigidity on motion of any of her joints. She had no ataxia on heel-to-shin testing. She has a normal gait.
 Examination of her back reveals a long scoliosis with an elevated right iliac crest. The curve flattens with left lateral bending and increases with right lateral bending. She did not have discomfort with range of motion of her spine.
 Palpation revealed tenderness that was present bilaterally over the lateral epicondyles of both elbows, the anterior chest wall, upper traps, levators, midscapular paraspinals, lumbar paraspinals, buttocks and greater trochanters.
 Impression:
 1. Chronic fatigue by history with multiple respiratory infections.
 2. Myofascial pain. *Page 19 
 3. Status post aneurysm surgery without significant neurologic residuals.
 4. Scoliosis
 Discussion: A review of Dr. Koletar's exam notes that she too found no neurologic abnormalities. She was unable to document an infectious etiology to explain the chronic fatigue and her statement regarding disability used the words "her perceived disability," and recommended perhaps further evaluation to be sure there was no other treatable condition. A review of the extensive documentation already done on this woman, however, makes one wonder what other investigations could be done. The information from the Cleveland Clinic does not come up with any etiology either.
 In summary, I could find no neurologic or musculoskeletal abnormality today that would preclude Ms. Kleja from being an elementary school teacher. Her strength and neurologic function is normal except for her mild hyperreflexia.
(Emphasis sic.)
 {¶ 41} 20. On an STRS form dated March 20, 2007, Dr. Wolfe certified that relator "is not incapacitated for the performance of duty."
 {¶ 42} 21. Following submission of Dr. Wolfe's reports to STRS, Dr. Metz requested that the MRB panel of doctors review the application again. Consequently, Drs. Wooley, Friedman and Allen submitted reports to Dr. Metz.
 {¶ 43} 22. In his April 7, 2007 report, Dr. Wooley states: "Upon review of the entire disability retirement application, it is my opinion that Beth Kleja is not permanently incapacitated for the performance of her usual duties as a Teacher."
 {¶ 44} 23. In his April 12, 2007 report, Dr. Allen states:
 In conclusion, in my opinion, there is insufficient documentation available to support a diagnosis of immune deficiency. There is insufficient documentation to exclude conditions that can mimic chronic fatigue syndrome, *Page 20 
including alcoholism. There is not objective evidence of neurologic or musculoskeletal impairment. I recommend that Dr. Wolfe's medical opinions be accepted and disability retirement not be awarded.
 {¶ 45} 24. In his April 16, 2007 report, Dr. Friedman states:
 Dr. Wolfe's evaluation led to her diagnosis of chronic fatigue with myofascial pain. She found no significant neurologic residual from Ms. Kleja's past aneurysm surgery. Dr. Wolfe did not find evidence of permanent disability on a neurologic or musculoskeletal basis.
 I concur with Dr. Wolfe that Ms. Kleja is not permanently disabled.
 {¶ 46} 25. In a letter to the STRB dated May 1, 2007, Dr. Metz wrote:
 The disability application of the above named member and the findings of the appointed examiners have been studied by the following Medical Review Board members, Dr. Charles Wooley, Dr. James Allen, and Dr. Barry Friedman. The Medical Review Board concurs with the opinions of the appointed examiners and recommends that disability benefits be denied.
 {¶ 47} 26. By letter dated May 21, 2007, relator was advised by STRS executive director Sandra L. Knoesel that STRB had denied her application for disability benefits at its May 18, 2007 meeting. The letter also advised relator that she had the right to appeal STRB's decision.
 {¶ 48} 27. By letter dated June 1, 2007, relator, through counsel, administratively appealed STRB's decision denying her application.
 {¶ 49} 28. In a seven-page letter to STRS dated September 12, 2007, relator's counsel challenged STRB's denial of the application.
 {¶ 50} 29. In support of her administrative appeal, relator submitted an August 7, 2007 letter from Dr. Modic and an August 30, 2007 letter from Dr. Chahine. *Page 21 
 {¶ 51} 30. Dr. Modic's August 7, 2007 letter states:
 Beth Kleja has been a patient of mine since May 16, 2000. In the last seven years I have treated her primarily for recurrent upper respiratory infections that I believe are based on an Immunodeficiency disorder. Over the last seven years Beth has been seen by an Immunologist, an Infectious disease specialist and a Hematologist. Everyone treated her for her Immunodeficiency disorder.
 Alcohol abuse was never as [sic] issue in regards to her disease state. Beth has admitted social drinking, mostly on weekends, when asked. I was not aware of any issues pertaining to alcohol abuse while Beth has been under my care.
 {¶ 52} 31. Dr. Chahine's August 30, 2007 letter states:
 Mrs. Klesia [sic] has history of hypergammaglobulemia which is an immune deficiency disorder contributing to her recurrent sinus infection and bronchitis. Her alcoholism has no relationship or no bearing on her medical condition.
 {¶ 53} 32. The record contains a lengthy memorandum to the STRB from Dr. Metz dated October 2, 2007:
 Beth Kleja is 52 years old and has a total of 25.38 years of service credit with STRS. She worked as a second grade teacher with the Austintown Local Schools and resigned her position in June 2005. The member applied for disability benefits in August 2006 and submitted a single-spaced, three page document describing her impairments. That document includes a description of symptoms associated with the "chronic fatigue syndrome" and much more, plus hypogammaglobulinemia, Lyme disease, etc. STRS received attending physician's reports from an internist and a hematologist and, later, from a Cleveland Clinic rheumatologist, Dr. Leonard Calabrese — all indicating that she was permanently disabled. The precise cause of the disability, however, was not documented precisely.
 Ms. Kleja was examined for STRS by an internist / infectious disease specialist, Dr. Sue Koletar in September 2006. Dr. Koletar found no significant abnormalities, but concluded *Page 22 
that the member was disabled based primarily on her history of fatigue. At that point[,] Dr. Koletar had little laboratory data to review and when that was forwarded to her she concluded that the member had mild hypogammaglobulinemia and nothing else of significance, but did not change her opinion that the member was disabled when those data were reviewed in January 2007.
 On January 8, 2007, STRS received reprints of newspaper articles with an Austintown heading indicating that Ms. Kleja had been charged with drunken driving after hitting a parked school bus at the Lloyd Elementary School and would be facing charges in the Mahoning County Area Court on May 5, 2005.
 On January 22, 2007, the STRS Medical Review Board met to consider Dr. Koletar's report and also had in hand the information regarding the charges of driving while drunk. The conclusion of the MRB was that there was insufficient objective evidence of medical impairment and an additional exam by a physiatrist, Dr. Claire Wolfe, was requested. Dr. Wolfe found no abnormalities other than the history of fatigue and hyperreflexia on the left side. Her conclusion was that Ms. Kleja was not disabled. The file was reviewed again by the Medical Review Board who concluded that there was insufficient evidence of disability and recommended denial.
 On September 13, 2007, STRS received a seven page letter from Mr. Stanley J. Okusewsky, III of the law firm of Green Haines Sgambati Co., L.P.A. which concludes that the MRB could not recommend denial of disability benefits based on why the member was terminated from employment, i.e., alcoholism. Be that as it may, there is little, if any, evidence that the member's alleged alcoholism was the primary consideration in their decision. On the contrary, there is virtually no evidence in the file that any of the member's numerous complaints are, singly or in combination, disabling. Moreover, one wonders if it is more than just a coincidence that, despite a reported life-long history of similar symptoms, the member did not request consideration for disability benefits until she was terminated.
 {¶ 54} 33. By letter dated October 23, 2007, STRS executive director Damon F. Asbury informed relator: *Page 23 
 An appeal hearing on the denial of your application for disability benefits was held before the Disability Review Panel on October 17, 2007. On October 19, 2007, the Retirement Board took official action to affirm its prior action to deny your application for disability benefits.
 {¶ 55} 34. On April 22, 2008, relator, Beth M. Kleja, filed this mandamus action.
Conclusions of Law: {¶ 56} Two main issues are presented: (1) whether respondent abused its discretion by allegedly relying upon the circumstances of relator's service termination, and (2) whether the record before this court shows an improper bias towards relator's application.
 {¶ 57} The magistrate finds: (1) respondent did not abuse its discretion to the extent that it may have relied upon the circumstances of relator's service termination, and (2) the record before this court does not show an improper bias towards relator's application.
 {¶ 58} Accordingly, it is the magistrate's decision that this court deny relator's request for a writ of mandamus, as more fully explained below.
 {¶ 59} Preliminarily, it should be noted that in State ex rel. Pipolyv. State Teachers Retirement Sys., 95 Ohio St.3d 327, 2002-Ohio-2219, it was held that respondent has no duty to state the evidence relied upon or to specify the reasoning for denying the application for a disability benefit. In Pipoly, the court refused to extend the requirements ofState ex rel. Noll v. Indus. Comm. (1991), 57 Ohio St.3d 203, to decisions of the respondent. *Page 24 
 {¶ 60} It should be further noted that respondent has not issued a decision that either states the evidence relied upon or specifies the reasoning for denying the application.
 {¶ 61} R.C. 3307.62(B) provides that the application for a disability benefit shall be made on a form approved by the respondent.
 {¶ 62} R.C. 3307.62(C) provides:
 Medical examination of the member shall be conducted by a competent, disinterested physician or physicians selected by the board to determine whether the member is mentally or physically incapacitated for the performance of duty by a disabling condition, either permanent or presumed to be permanent for twelve continuous months following the filing of an application. * * *
 {¶ 63} R.C. 3307.62(D) provides:
 Application for a disability benefit must be made within two years from the date the member's contributing service terminated, unless the board determines that the member's medical records demonstrate conclusively that at the time the two-year period expired, the member was physically or mentally incapacitated for duty as a teacher and unable to make application. * * *
 {¶ 64} Supplementing the statute, Ohio Adm. Code 3307:1-7-02 provides:
 (A) The retirement board shall appoint an independent physician to serve as chair of the medical review board and as medical advisor to the retirement board. The chair so appointed shall:
 (1) Request and review medical evidence from the applicant's attending physicians and other relevant sources regarding the nature, findings, extent, treatment, duration and functional limitations imposed by the conditions the applicant claims as disabling.
 (2) Assign and oversee competent and impartial independent medical examiners to conduct the medical *Page 25 
examinations and tests the chair deems necessary and appropriate to the evaluation of an application. The independent medical examiners shall provide written reports of their findings and conclusions as to whether applicants are mentally or physically incapacitated from the performance of regular duties for a period of at least twelve months.
 (3) Review the reports of the independent medical examiners. Once the chair is satisfied that no further examinations or tests are needed, a recommendation shall be submitted to the retirement board if the chair concurs in the conclusions of the independent medical examiner or examiners that an applicant is or will be mentally or physically incapacitated from regular duties for a period of at least twelve months.
 (4) If the chair concurs in the conclusions of the independent medical examiners that an applicant is not incapacitated from the performance of regular duties or will not remain incapacitated for at least twelve months, convene a panel of three other members of the medical review board who shall review the reports of the independent medical examiners. The panel may obtain such further examinations and tests as it may judge necessary and appropriate and may direct delay of consideration of an application for treatment.
 (5) Submit to the retirement board a report summarizing the conclusions and recommendations of the panels of the medical review board members.
 {¶ 65} According to relator, R.C. 3307.62(C) and (D) and Ohio Adm. Code 307:1-7-02 must be interpreted to preclude respondent's reliance on the circumstances of relator's termination from her service as a teacher from Austintown. Relator suggests that those authorities preclude any reliance upon the circumstances of relator's service termination. The magistrate disagrees.
 {¶ 66} Under R.C. 3307.62(D), termination from service begins the running of a two-year period during which an application for a disability benefit may be filed. An *Page 26 
application may not be filed beyond the two-year period unless the board determines that the member was unable to make the application due to physical or mental incapacity. According to relator:
 * * * Here, the statutory language is plain. There is no additional language in the statute that demonstrates an intention by the General Assembly to condition a member's receipt of disability benefits on how their service terminated. Therefore, to be entitled to disability benefits, Kleja only had to demonstrate that her service terminated within two years.
(Relator's brief, at 20.)
 {¶ 67} Thus, relator argues that service termination can only be relevant to the running of the two-year period and can never be relevant to other issues before STRB. In short, relator argues that R.C. 3307.62(D)'s failure to specify that service termination (and the circumstances of such termination) can be relevant to issues other than determination of the application's timeliness must be viewed as a statutory prohibition against any reliance upon the circumstances of service termination with respect to other issues presented by the application. Relator's argument lacks merit.
 {¶ 68} If the meaning of a statute is unambiguous and definite, it must be applied as written and no further interpretation is necessary.State ex rel. Burrows v. Indus. Comm. (1997), 78 Ohio St.3d 78, 81. Unambiguous statutes are to be applied according to the plain meaning of the words used. Id. Courts are not free to delete or insert other words. Id.
 {¶ 69} Relator's argument that R.C. 3307.62(D) prohibits STRB reliance upon the circumstances of service termination because the statute does not address that subject violates the fundamental rules of statutory interpretation. Relator is, in effect, asking *Page 27 
this court to rewrite the statute so that it not only addresses subject matter that is not addressed, but, also, states what relator would like the statute to say. No court has the authority to do what relator is inviting this court to do.
 {¶ 70} Relator makes a similar argument with respect to Ohio Adm. Code 307:1-7-02. Relator argues or suggests that because the rule does not specifically provide that the chair of the MRB has authority to consider the circumstances of service termination when evaluating medical evidence, it must be concluded that the rule prohibits the chair from considering or relying upon the circumstances of service termination in the performance of his duties under the rule. Again, relator's argument lacks merit.
 {¶ 71} The rule simply does not address the subject matter that relator would like it to address nor does it say what relator would like it to say.
 {¶ 72} The record before this court repeatedly and consistently shows that Dr. Metz and the MRB panel of doctors viewed the circumstances of service termination as highly relevant to their individual determinations regarding the credibility of the medical reports submitted by relator's doctors and by Dr. Koletar. Relator argues that it was improper for Dr. Metz and the MRB panel to use evidence of the circumstances of service termination to test the credibility of the medical evidence. Relator is incorrect.
 {¶ 73} Contrary to relator's suggestion, nothing in Ohio Adm. Code 307:1-7-02 or the statute it supplements, prohibits the chair and the MRB panel from determining the credibility of the medical evidence before them in light of the circumstances of service termination when those circumstances are relevant to the credibility of the medical *Page 28 
evidence. Nothing in the rule or statute prohibits the use of nonmedical factors to test the credibility of the medical evidence.
 {¶ 74} A workers' compensation mandamus case is instructive in that regard. In State ex rel. Ohio Treatment Alliance v. Paasewe,99 Ohio St.3d 18, 2003-Ohio-2449, the court held that a claim for temporary total disability ("TTD") compensation that is close in time to a claimant's job termination will be closely scrutinized.
 {¶ 75} In Paasewe, the claimant, Eric Paasewe, returned to work on July 13, 2000. He worked on July 13, 14 and 15 without any reported medical problems. On July 15, a co-worker discovered Paasewe asleep on the job. Paasewe was fired two days later for the offense. Thereafter, Paasewe claimed that he was temporarily and totally disabled during the period immediately following his job termination. The Paasewe court states:
 * * * He now claims a new period of disability that conincidentally arose on the date of his discharge[.] * * *
 * * *
 Within the space of a few hours, claimant asserts, his nondisabling condition deteriorated into a disabling one, on a date that coincided with his firing. * * *
Id. at ¶ 10, 12.
 {¶ 76} The credibility issue before the STRB was succinctly summarized in the October 2, 2007 memorandum of Dr. Metz to the STRB:
 * * * [T]here is virtually no evidence in the file that any of the member's numerous complaints are, singly or in combination, disabling. Moreover, one wonders if it is more than just a coincidence that, despite a reported life-long history of similar symptoms, the member did not request consideration for disability benefits until she was terminated. *Page 29 
 {¶ 77} As the Paasewe case instructs, that relator's disability claim coincided with her service termination was a factor for consideration by Dr. Metz and the MRB panel as well as STRB who ultimately decides.
 {¶ 78} Moreover, the so-called "coincidence" addressed by Dr. Metz in his October 2, 2007 memorandum was not the only matter rendering relevant the circumstances of service retirement. As Dr. Allen indicates in his January 22, 2007 report, Dr. Koletar's report was questioned because the circumstances of service termination appear to be inconsistent with Dr. Koletar's statement "she occasionally drinks alcohol." Dr. Allen argued that the circumstances of service termination "strongly suggests greater alcohol consumption than she reported to Dr. Koletar and suggests that Mrs. Kleja was not entirely forthcoming or truthful in the history that she supplied to Dr. Koletar." Dr. Allen concluded "[t]here is insufficient documentation to exclude conditions that can mimic chronic fatigue syndrome, including alcoholism."
 {¶ 79} Here, relator criticizes Dr. Wolfe's report for avoiding the question posed by Dr. Allen as to whether alcoholism was mimicking the symptoms of chronic fatigue syndrome. (Relator's brief, at 17.)
 {¶ 80} Even if it can be said that Dr. Wolfe did not answer Dr. Allen's query, that would not eliminate Dr. Wolfe's report from evidentiary reliance by STRB. Relator has never claimed that she suffers from alcoholism nor has she ever asked STRB to consider alcoholism as a contributing condition.
 {¶ 81} Relator also contends that under R.C. 3307.62(C), Dr. Wolfe cannot be a "disinterested" physician because she was provided information regarding the circumstances of service termination. This contention lacks merit. It was clearly *Page 30 
appropriate for STRS to provide Dr. Wolfe with the information it had regarding the circumstances of service termination.
 {¶ 82} Relator's claim of bias throughout the STRS proceedings is in large part premised upon the erroneous assumption that it was improper for STRS to consider the circumstances of her service termination. Thus, relator's bias claim is seriously undermined by the above analysis.
 {¶ 83} However, relator strongly urges that Dr. Metz's January 9, 2007 notice of the January 22, 2007 conference is evidence of bias on the part of Dr. Metz and that the bias influenced the MRB panel of doctors. Relator alleges that two factors support bias. First, relator points to the fact that the notice issued the day following STRS's receipt of the report of employer. Secondly, relator points to the fact that the word "DENIAL" appears above relator's name.
 {¶ 84} The first point is easily answered. Apparently, relator suggests that Dr. Metz was too quick to schedule a conference following STRS's receipt of the "Report of Employer" that disclosed the circumstances of service termination. However, it is difficult to fault Dr. Metz for promptly scheduling a conference to consider the evidence just received. Moreover, the conference was scheduled for January 22, 2007, 13 days after the notice issued. There is no contention that 13 days was insufficient time for the MRB to review the record before it in preparation for the conference.
 {¶ 85} The second point is perhaps more difficult to answer because we simply do not know for sure why the word "DENIAL" was placed above relator's name. Relator seems to invite this court to speculate that placement of the word "DENIAL" on the *Page 31 
notice prejudiced the MRB review that occurred January 22, 2007. This magistrate declines the invitation.
 {¶ 86} Even if it can be said that placement of the word "DENIAL" on the notice was Dr. Metz's expression of his opinion as to the merits of relator's application based on the "Report of Employer," that alone is not evidence that Dr. Metz exercised undue influence over the MRB panel of doctors. In the absence of more, the presumption remains that the MRB panel of doctors were able to exercise their independent judgments that may or may not differ from that of their colleagues.
 {¶ 87} In short, there is indeed no evidence of bias in the record before this court.
 {¶ 88} Accordingly, for all the above reasons, it is the magistrate's decision that this court deny relator's request for a writ of mandamus. *Page 1